IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CARRIE E. EDWARDS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION 08-00743-B |
| | * | |
| MICHAEL J. ASTRUE, | * | |
| Commissioner of | * | |
| Social Security, | * | |
| | * | |
| Defendant. | * | |

## ORDER

Plaintiff Carrie E. Edwards ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for period of disability, disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., and 1381 et seq.  On August 28, 2009, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 20).  Thus, this case was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636( c) and Fed.R.Civ.P. 73.  (Doc. 23). The parties waived oral argument.  Upon careful consideration of the administrative and the memoranda of the parties, it is **ORDERED** that the decision of the Commissioner be **REVERSED and REMANDED.**

1

## I.  __Procedural History__

Plaintiff protectively filed applications for Disability Supplemental Security Income (SSI) on August 28, 2003 (Tr. 125). Plaintiff alleges that she has been disabled since August 15, 2003, due to nerve problems, headaches and inability to sleep. (Tr. 141). Her application was denied upon initial consideration on May 9, 2003 (Tr. 81-82).  In response to Plaintiff's request for a hearing, Administrative Law Judge Charles A. Thigpen ("ALJ") conducted a hearing on April 12, 2005. (Tr. 35-56).  On June 20, 2005, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Tr. 508-521).  Upon Plaintiff's request for review, the Appeals Council ("AC") remanded the case to the ALJ with instructions for further proceedings.  (Tr. 522-525).

Subsequent thereto, on April 18, 2006, Judge Thigpen conducted a second hearing, which was attended by Plaintiff, her representative, a vocational expert and a medical expert. (Tr. 57-80).  ALJ Thigpen issued an unfavorable decision on August 18, 2006.  (Tr. 14-29).  Plaintiff's request for review was denied by the AC on July 8, 2008.  (Tr. 5-8).  The ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981.  (__Id.__)  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

2

II.   **Issues on Appeal**

A.   Whether the ALJ erred in basing his finding that Plaintiff was capable of performing other work on the opinion of a non-examining psychologist, and in failing to consider the opinions of examining sources.

B.   Whether the ALJ erred in failing to consider Plaintiff's intellectual limitations in finding Plaintiff did not meet Listing 12.05, and in not developing the record as to those limitations.

III.  **Factual Background**

Plaintiff was born on January 12, 1970, and was 36 years old at the time of the April 2006 hearing.  (Tr. 57, 60, 81, 83, 122, 131).  At the April 2005 hearing, Plaintiff testified that she attended school through the tenth grade, that she was in special education classes, that she is cannot read and write "that well," and that she can do simple arithmetic.  (Tr. 38).  She testified that she worked as a packer at Central Alabama Packing about five years before, and became disabled on August 15, 2003 due to pain in her right arm.  (Tr. 39-41).  She also reported that she is unable to work because of pain in her bad, and due to her nerves.  (Tr. 41).  In addition, she reported trouble with her thyroid.  (Tr. 41-42).  Plaintiff also testified that she had problems with alcohol and marijuana in the past and attributed her use to being abused and raped as a child. (Tr. 42-43).

At the April 2006 hearing, Plaintiff testified that she last

3

worked at a hotel as a housekeeper for a year. (Tr. 60-61). According to Plaintiff, she missed work because she was tired and her nerves were bad. (Tr. 61-62). Plaintiff also testified that she sometimes has trouble following directions, and that she lost her job at Sonic after two weeks because she kept coming up short on change due to problems counting. (Tr. 65). Plaintiff further testified that her godfather assists her in paying her bills and getting to doctors' appointments. (Tr. 66). Plaintiff testified that she is depressed because she lost her children, that she stays home most of the time, and that she does not have any friends. (Tr. 68).

IV.  **Analysis**

    A.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[1] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of

---

[1]This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11ᵗʰ Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11ᵗʰ Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11ᵗʰ Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.   <u>Discussion</u>**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§

5

404.1520, 416.920.[2]

In the case <u>sub judice</u>, the ALJ determined that while Plaintiff has the severe impairments of major depressive disorder, history of intermittent back strain, hypertension, history of headaches, and history of drug abuse, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (Tr. 28). The ALJ found that Plaintiff's allegations of pain and functional limitations were not supported by the record to the degree alleged by Plaintiff. <u>Id</u>.

---

[2]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. <u>Id</u>. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). <u>See also</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

The ALJ also concluded Plaintiff retains the residual functional capacity ("RFC") to lift and carry objects weighing up to 30 pounds and to frequently lift or carry objects weighing up to 20 pounds; stand and walk no more than four hours in an eight-hour workday, and sit for an unlimited time. The ALJ further concluded that Plaintiff cannot work at activities involving proximity to moving mechanical parts, high, exposed places, or driving automotive equipment. Id. The ALJ further determined that Plaintiff cannot perform any of her past relevant work, but that she is capable of performing a significant number of occupations in the national economy. (Tr. 29).

The relevant evidence[3] of record includes treatment records from Selma Doctors Clinic dated February, August and November 2003, and June and October 2004. On February 3, 2003, Plaintiff reported thyroid problems, and problems swallowing. Plaintiff also reported that she had quit smoking marijuana, but started back when the thyroid pain became severe. The treatment notes reference la belle indifference[4], and possible primary gain issues. Plaintiff's

---

[3]While the undersigned has examined all of the medical evidence contained in the record, including that which was generated before Plaintiff's alleged onset date, only that evidence which is relevant to the issues before the Court is included in the summary.

[4]La belle indifference occurs when one shows an inappropriate lack of concern about his disabilities, occurring in certain patients with conversion disorders . See, www.dictionary-psychology.com. (Last visited October 20, 2009).

physical and mental exam were normal. (Tr. 427). On August 5, 2003, Plaintiff again complained of thyroid problems and reported that she stopped doing drugs, but smokes marijuana and crack occasionally. Her physical and mental exams were normal, and she was diagnosed with anxiety and depression. She was encouraged to make an appointment with Dr. Hodo. (Tr. 426). During 2004, Plaintiff complained of lower abdominal pain, and of anxiousness. Psychosocial exams revealed that Plaintiff had a clean appearance and appropriate mood, and that she was able to ambulate independently and perform activities of daily living independently. She was also oriented to person, place and time. (Tr. 593-595, 599-607).

Plaintiff was also treated at Cahaba Center for Mental Health ("CCMH"). The records reflect Plaintiff sought treatment in November 2002 and reported anxiety, blackouts and illicit drug use. She also reported that she had lost custody of her kids. It was noted that Plaintiff felt overwhelmed by the issues of life, and a treatment plan was developed to provide her with individual, group and family counseling, random drug screens, HIV education, and psychiatric referral. She was diagnosed with cannabis dependence and cocaine abuse, and was assessed a GAF of 31[5]. (Tr. 447). The

---

[5]The Global Assessment of Functioning (hereinafter "GAF") is a numeric scale used to rate the social, occupational and psychological functioning of adults. A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family

notes dated February 5, 2003 reflect that Plaintiff was making good progress with respect to her drug use as her drug and alcohol screens were negative.  It was also noted that she was not making any progress towards her GED, and was making fair progress towards taking steps to regain custody of her children. (Tr. 444).

Plaintiff next sought treatment at CCMH on August 18, 2003, and was evaluated by therapist Carrie Bearden, MS, ALC.  During screening, Plaintiff reported nerve problems, anxiety attacks and vomiting.  (Tr. 443, 493).  Plaintiff also reported that her children had been removed from her two years earlier because she failed to report her boyfriend's rape of one of her daughters. She also reported that she had used drugs in the past five years, but had been sober since 2000.  (Tr. 442, 492). On mental status exam, Plaintiff had appropriate grooming and hygiene; fair appetite; normal weight; poor sleep with insomnia and nightmares; dysphoric mood; appropriate affect; calm motor activity; appropriate speech pattern, thought process, and perception; adequate judgment; and easy distraction.  She was diagnosed with major depressive disorder, recurrent, and assigned a GAF of 55[6].  (Tr. 438-443, 488-490).

---

relations, judgment, thinking, or mood. <u>See</u>, <u>http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp</u>. (Last visited March 25, 2010.)

[6]A GAF of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. <u>See</u>, <u>http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp</u>. (Last visited March 25, 2010.)

Plaintiff was treated on September 18, 2003 at CCMH by psychiatrist Winston Pineda, M.D.  Dr. Pineda noted that Plaintiff was seen at the center four years ago earlier for outpatient counseling and alcohol abuse.  He observed that Plaintiff was dysphoric, teary eyed and anhedonia.  Plaintiff reported poor sleep, lack of energy, and guilt about not taking good care of her children.  Plaintiff did not have any suicidal thoughts, psychosis or thought disorders.  On mental exam, Plaintiff was lethargic but engageable, with depressed affect, congruent mood, and coherent and relevant thoughts.  Dr. Pineda noted that her memory and concentration were grossly intact, and estimated her intellectual functioning to be below average.  Plaintiff was prescribed Trazodone[7].  (Tr. 436-437, 481-482).

Plaintiff attended a therapy session at CCMH on October 24, 2003.  Her mental status exam revealed appropriate appearance/grooming and affect; dysphoric mood; fair sleep and appetite; normal orientation; calm motor activity; and no side effects from her medications.  She was assessed a GAF of 55.  (Tr. 476, 484).

Plaintiff next treatment at CCMH was with Dr. Pineda on February 18, 2004.  Plaintiff was dysphoric and depressed, and she

---

[7]Trazadone is an antidepressant medication, used for relief of anxiety disorders.  See, www.drugs.com.  Last visited October 20. 2009.

reported auditory and visual misperceptions, but no suicidal thoughts. On mental status exam, Dr. Pineda noted hygiene and grooming below average, depressed affect, coherent and relevant thoughts, and intact insight and judgment. He prescribed her Zyprexa[8] and Prozac[9] and increased her Trazodone. (Tr. 474, 480). Plaintiff also had a therapy session on this day. On mental status exam, Plaintiff's appearance/grooming were inappropriate; her affect was appropriate, her mood was dysphoric, her sleep was poor with nightmares; her appetite was poor, her orientation was normal, and her motor activity was calm. She was assigned a GAF of 55. (Tr. 475, 483).

Plaintiff's next visit to CCMH was on November 1, 2004. She reported working at Holiday Inn and Subway, but indicated she was not working much because of anxiety attacks. She also reported that she was unable to sleep or eat, that she was having nightmares, and that she lost 32 pounds in two weeks. (Tr. 751A). During a February 17, 2005 visit to CCMH, Plaintiff reported having problems keeping a job without medication, and that she wanted to restart treatment. (Tr. 751).

_____

[8]Zyprexa is an atypical antipsychotic medication, used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression). See, www.drugs.com. (Last visited October 20. 2009).

[9]Prozac is an antidepressant used to treat major depressive disorder. See, www.drugs.com. (Last visited October 20, 2009).

Plaintiff was treated at CCMH on May 2, 2005.  In a mental status exam, she reported good appetite, normal weight, poor sleep with nightmares and sleep walking, auditory hallucinations, constricted affect and easy distraction.  Her motor activity was agitated, her speech pattern and thought process appropriate, her orientation normal and her judgment adequate. (Tr. 745). Plaintiff reported that she wanted to get back on medication.  (Tr. 750).

Plaintiff underwent a therapy session at CCMH on May 18, 2005.  On mental status exam, her appearance/grooming and affect were appropriate, and her mood dysphoric.  It was noted that Plaintiff was not coping well, and that she was angry and reported flashbacks of being abused by her father.  (Tr. 741).

Plaintiff was treated by Dr. Pineda at CCMH on September 20, 2005.  Dr. Pineda reported that Plaintiff appeared down, but responded fairly well to encouragement.  On mental status exam, Dr. Pineda noted hygiene and grooming below average, dysphoric affect, congruent mood, and coherent and logical thoughts, with no evidence of thought disorder.  Her memory and concentration were grossly intact.  Dr. Pineda estimated that her intellectual functioning is borderline to mild mental retardation.  He diagnosed Plaintiff with major depressive disorder, recurrent, and prescribed Lexapro[10] and

_____

[10]Lexapro is an antidepressant used to treat anxiety in adults and major depressive disorder in adults and adolescents. See, www.drugs.com.  (Last visited October 20, 2009).

Trazodone.   (Tr. 773).

Plaintiff returned to Dr. Pineda on November 11, 2005 for a routine appointment.  He noted that Plaintiff was somewhat better on Lexapro and Trazodone but she experienced distressful nightmares and attributes them to Trazodone.  He also noted Plaintiff looked better, but continued to struggle with depressive symptoms, and that she responded fairly well to empathetic listening and encouragement. (Tr. 772).

Plaintiff was seen by Dr. Pineda on January 9, 2006 for a follow-up.  Dr. Pineda listed Plaintiff's medications as Lexapro and Vistaril[11], and noted that she still experienced significant depression and poor sleep.  He also noted that Plaintiff was sad about losing her three children, but continued to respond favorably to encouragement and empathic listening.  Dr. Pindea continued her on Lexapro, and changed the Vistaril to Sinequan[12].  (Tr. 770).

Plaintiff was treated at Selma Doctors Clinic in February and August 2003.  She reported thyroid problems and that she had started back using marijuana to help with severe pain in her throat. Plaintiff's physical and mental exams were normal and she was

---

[11]Vistaril is acts as an antihistamine and is used as a sedative to treat anxiety and tension. See, www.drugs.com. (Last visited October 20, 2009).

[12]Sinequan is an antidepressant used to treat symptoms of depression and/or anxiety associated with alcoholism, psychiatric conditions, or manic-depressive conditions. See, www.drugs.com. (Last visited October 20, 2009).

diagnosed with anxiety and depression. (Tr. 426-427)

Plaintiff was treated at Selma Regional Medical Center in 2003 and 2004. She reported tooth pain, lower abdominal pain, and anxiousness.  The treatment notes reflect that she had a clean appearance and appropriate mood, and that she was able to ambulate independently and perform activities of daily living independently. She was also oriented to person, place and time.  (Tr. 593-595).

Psychologist William H. Lynn, Ph.D. completed a Psychological Review Technique form on October 31, 2003.  He diagnosed Plaintiff with anxiety and depression, and noted her history of polysubstance abuse.  Dr. Lynn opined that Plaintiff is mildly limited in her activities of daily living, and moderately limited in her ability to maintain social functioning and to maintain concentration, persistence or pace.  (Tr. 457-471).

On January 5, 2004, Paul T. Chittom, M.D., of the Selma Doctors' Clinic, completed an Assessment of Ability to do Work-Related Activities (Mental) form.  He opined that Plaintiff is mildly to moderately limited in her ability to relate to other people, to maintain concentration and attention for extended periods and in her activities of daily living.  He further opined that Plaintiff is mildly limited in her ability to sustain a routine without special supervision and to perform activities within a schedule, maintain regular attendance and be punctual.  He opined that Plaintiff is moderately limited in her ability to respond to

14

customary work pressures, respond appropriately to changes in the work setting, perform complex, repetitive or varied tasks, and behave in an emotionally stable manner.  He also opined that Plaintiff is mildly limited in her ability to understand, carry out and remember instructions, respond appropriately to supervision and to co-workers, use good judgment and perform simple tasks. According to Dr. Chittom, Plaintiff's limitations have lasted or can be expected to last for 12 months, her medications have a minimal effect on her ability to function, and she can manage her benefits on her own.  He diagnosed Plaintiff with chronic neurotic depression which results in repeated episodes of deterioration or decompensation in work or work-like settings and thereby cause her to withdraw or to experience exacerbation of signs and symptoms. (Tr. 736-738).

Plaintiff was referred by her attorney for a psychological evaluation by Robert A. Storjohann, Ph.D.  She underwent the evaluation on March 31, 2005.  On mental status exam, Dr. Storjohann reported that Plaintiff was appropriately dressed and groomed, her demeanor was extremely ill-at-ease and socially uncomfortable, severely dysphoric, despondent, forlorn, withdrawn, distracted and preoccupied.  Her overall thinking style was concrete and verbal comprehension skills were very poor.  Her speech was normal in pace and tone, her mood was severely depressed, intensely anxious and very tense, and her affect was blunted in range.  She was oriented

15

to person, place situation and time, her recent memory was grossly intact and her remote memory was poor. Her thoughts and speech were logical, coherent and goal-directed, her thoughts were without loose associations or confusion, and she was circumstantial and tangential in most of her responses. No hallucinations or delusions were observed. Dr. Sotrjohann opined that her social judgment and interpersonal insight are poor, and that she is unable to make acceptable work decisions, or manage her own financial affairs. He estimated her intellectual functioning to be in the mild range of mental retardation to the low borderline range.

Dr. Sotrjohann diagnosed Plaintiff with posttraumatic stress disorder, chronic, severe; major depression, recurrent, severe, with mood-congruent psychotic features; generalized anxiety disorder; social phobia generalized; cannabis dependence, sustained full remission; dependent personality disorder, borderline personality disorder; schizoid personality disorder; high blood pressure; stomach ulcers; headaches; thyroid problems with history of surgery on the thyroid gland; pain in shoulders and low back; bouts of constipation and diarrhea; and headaches. He assigned Plaintiff a GAF of 35. (Tr. 573-577).

Dr. Storjohann completed a Medical Source Statement (Mental) on the same day. He opined that Plaintiff is extremely limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and

16

to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  He opined that Plaintiff has a marked to extreme limitation in her ability to maintain attention and concentration for extended periods; to respond appropriately to supervision; to respond appropriately to changes in the work setting; and to respond to customary work pressures.  (Tr. 578-580).

Dr. Storjohann additionally opined that Plaintiff has a marked limitation in her ability to understand, remember and carry out complex instructions; to understand, remember and carry out repetitive tasks; to sustain a routine without special supervision; and to make simple work-related decisions.  He opined that Plaintiff is moderately to markedly limited in her ability to get along with coworkers or peers, and in her activities of daily living.  He also opined that Plaintiff is moderately limited in her ability to interact appropriately with the general public; in her personal habits; in her ability to understand, remember and carry out complex instructions; and in her ability to be aware of normal hazards and take appropriate precautions.  He further opined that Plaintiff is mildly limited in her ability to ask simple questions or request assistance.  (Tr. 578-580).

At the request of the Agency, Plaintiff underwent a physical evaluation on December 30, 2005 by Alan M. Babb, M.D.  Dr. Babb

noted that Plaintiff appeared "almost robotic and zombified," and stared at the floor throughout the interview. He also noted that Plaintiff appeared severely retarded and emotionally devastated by the abuse. (Tr. 755-756).

Dr. Babb reported that Plaintiff's physical exam was normal, and her neurologic exam reflected a very flat, retarded affect, normal grip strength, normal sensory-motor exam, very poor intellectual skills, extremely poor fund of information, and an ability to follow simple instructions. He noted that the neurologic findings are consistent with severe retardation and "almost medication-induced bradykinesia." His impressions were of chronic neurotic depression, long history of severe domestic abuse from father, mother, husbands and boyfriends; tobacco abuse; hypertension; mild mental retardation; status post partial thyroidectomy; and status post breast reduction. He noted Plaintiff's severe and profound learning problems and emotional problems, and opined that she needs extensive psychiatric management. He further opined that it is unlikely anyone would hire Plaintiff in her current state, due to her extremely poor educational background, lack of skills, and lack of motivation. (Tr. 757-758).

Dr. Babb also completed a Medical Source Opinion (Physical) on December 30, 2005. He opined that Plaintiff can stand/walk 30 minutes at a time and four hours total in an eight-hour workday, and

18

can lift/carry 10 pounds constantly, 20 pounds frequently and 30 pounds occasionally.  He further opined that Plaintiff has no limitation in her ability to push/pull with her arms or legs, or in her ability to climb, balance, stoop, kneel, crouch, crawl, handle, finger, feel, talk, hear, or reach overhead.  He limited her to never working in proximity to moving mechanical parts, in high, exposed places, or driving automotive equipment.  (Tr. 760-762).

Plaintiff was evaluated by Richard S. Reynolds, PH.D., on January 20, 2006 at the request of the Agency. On mental status exam, Dr. Reynolds noted that Plaintiff was alert and oriented to person, place, time and situation and was cooperative.  He further stated that her speech was within normal limits, her stream of thought appeared slow, that she often heard her mother call her name, and that she was depressed and tired.  He stated that Plaintiff's affect was sad.  Plaintiff reported her current symptoms as sleep disturbance, nausea, nerves, sadness, tearfulness, crying spells and feeling down.  She denied suicidal and homicidal ideation, had fair recent and remote memory, and her judgment, insight and decision-making abilities appeared impaired.  Plaintiff was administered the Wechsler Adult Intelligence Scale – Third Edition ("WAIS-III"), which resulted in a verbal IQ score of 56, performance IQ score of 53 and full-scale IQ score of 50.  Dr. Reynolds opined that her full-scale IQ score of 50 was likely due to mental illness, most likely schizophrenia, and that previous

testing and/or school records should be obtained to determine her intellectual functioning.  (Tr. 764-765).

Dr. Reynolds also completed a Medical Source Opinion Form (Mental) on January 20, 2006.  He opined that Plaintiff was markedly limited in her ability to respond appropriately to supervisors, and to customers or other members of the general public; and to understand, remember, and carry out detailed or complex instructions, to maintain attention, concentration or pace for periods of at least two hours, to maintain social functioning and to maintain activities of daily living.  He further opined that Plaintiff is moderately limited in her ability to respond appropriately to co-workers, and to use judgment in simple one or two step work-related decisions.  He opined that Plaintiff is mildly limited in her ability to understand, remember and carry out simple one and two-step instructions.  (Tr. 767-768).

Doug McKeon, M.D., testified at Plaintiff's administrative hearings.  He noted Plaintiff's "significant history of marijuana and cocaine use and abuse and her one year of treatment."  He opined that the overall record indicates an individual with anxiety and depressive symptomotology, identified after substance abuse issues. He determined that there was no information in the record to establish a 12.05 consideration.  He also opined that the appropriate category for evaluation for Plaintiff's claims was under 12.04 for affective disorders, with major depression with primary

20

symptoms of sleep disturbance, psychomotor retardation, decreased
energy, and reports of difficulty with concentrating and thinking.
He opined that Plaintiff does not meet 12.04.  He further opined
that Plaintiff has a mild to moderate impairment in activities of
daily living, a mild impairment of social functioning, and a mild
to moderate impairment of concentration, persistence and pace with
no periods of decompensation.  He further opined that she has a
marked impairment in the ability to complete complex tasks, a mild
impairment in completing simple tasks, a mild to moderate impairment
in concentration, persistence and pace in work-related activities
up to two hours, and a mild to moderate impairment in tolerating and
dealing with work stresses.  He stated that the record establishes
depressive symptomotology, treated from 2004, and substance abuse
prior to that time.  (Tr. 71-73).

    **1.    Whether the ALJ erred in failing to consider Plaintiff's
        intellectual limitations in finding that she did not meet
        a Listing 12.05[13], and in not developing the record as to
        those limitations.**

Plaintiff asserts that the ALJ erred in failing to properly
consider her intellectual deficiencies in determining whether
Plaintiff meets or equals Listing 12.05, and in failing to develop
the record in making that determination.  Listing 12.05, the listing
category for mental retardation, begins with an introductory
paragraph, which states that "[m]ental retardation refers to

---

[13]20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. The listing further provides that the "required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." Id. Subsection C requires a claimant to demonstrate "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. at § 12.05C.

In this case, the ALJ held that Plaintiff's impairments do not meet or equal a Listing, and stated as follows:

> Under the third step, I must determine whether these impairments meet or equal in severity any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. No treating or examining source or medical expert has so concluded. In addition, I have examined the record, and I find that the evidence does not support such a conclusion. In particular, I have considered listing 12.05 for mental retardation. In January 2006, Richard S. Reynolds, Ph.D., administered the Wechsler Adult Intelligence Scale – Third Edition. The claimant obtained a Verbal IQ score of 56, Performance IQ score of 53 and Full Scale IQ score of 50. . . . While these scores would appear to meet one criteria in said listing, the examiner indicated that they were not valid estimates of claimant's true intellectual functioning but were likely depressed due to her mental illness. Thus, I find that the claimant's impairments, considered singularly and in combination, are not of listing-level severity.

(Tr. 19).

While the ALJ stated that Dr. Reynolds indicated that the scores were "not valid," what Dr. Reynolds actually stated is as follows:

> Ms. Edwards was administered the WAIS-III today. She obtained a full scale IQ score of 50. It is believed that these results are likely as low as they are due to mental illness. Previous testing and/or school records should be obtained to determine previous intellectual functioning.

(Tr. 765). A close reading of Dr. Reynolds' report reveals that he opined that the results were "likely" as low as they were due to mental illness, and he recommended that "[p]revious testing and/or school records should be obtained in order to determine previous intellectual functioning. In addition, Dr. Pineda, who treated Plaintiff at CCMH for a number of years, also questioned her level of intellectual functioning. In September 2003, Dr. Pineda estimated that Plaintiff's intellectual functioning was below average, and in September 2005, he opined that Plaintiff's intellectual functioning was borderline to mild mental retardation. (Tr. 437, 482, 773). Also, when Plaintiff was examined by Robert Storjohann, Ph.D., in March 2005, he opined that her intellectual functioning fell in the mild range of mental retardation to the low borderline range. He opined that "[a]dditional assessment with a WAIS-III and a WRAT is needed to determine more specifically her level of intellectual and academic functioning". (Tr. 577). Additionally, when Plaintiff was examined by Alan M. Babb, M.D., in

December 2005, he observed that Plaintiff appeared to be "severely retarded" and that she displayed "very poor intellectual skills". (Tr. 755- 758).   It is also noteworthy that at the April 2006 administrative hearing, the medical expert testified as follows:

> Dr. Richard Reynolds saw the claimant on January 20, 2006.  His evaluation included intellectual testing which indicated I.Q. scores in the low 50s.  He did consider mild retardation but felt that her scores were suppressed due to her mental health related problems...There is no information to establish a 12.05 consideration based on the record. There are conflicting reports in the record where at different times she has indicated she can read and write and then at other times where she indicates that she can't. There is no school record that can substantiate limited functioning at that level. For that reason the 12.05 category was not considered.

(Tr. 70-72).

Based upon the record before the Court, the undersigned finds that the ALJ failed in fully developing the record to determine if Plaintiff meets or equals a listing under 12.05.   Nearly every doctor who actually examined Plaintiff questioned her intellectual functioning.   Moreover, while Dr. Reynolds suggested that Plaintiff's low IQ scores may have been suppressed by her mental problems, he did not rule out mental retardation.   Instead, he recommended that Plaintiff's previous testing and/or school records be obtained in order to determine her previous intellectual

functioning.   This was particularly important where Plaintiff testified that she was in special education classes, and that she is not able to read and write well.   Rather than fully developing the record on this issue, the ALJ erroneously relied upon the opinion of the non-examining medical expert, Dr. McKeon, who testified that because Dr. Reynolds questioned the IQ scores, and the record did not contain any educational records on this issue, the 12.05 category need not be considered.

The ALJ is required to fully develop the record. <u>Brown v. Shalala</u>, 44 F. 3d 931, 934 (11th Cir. 1995); <u>Lucas v. Sullivan</u>, 918 F. 2d 1567, 1573 (11th Cir. 1990).   This duty to develop the record exists even when the plaintiff is represented by a lawyer. <u>Brown</u>, 44 F.3d at 934.   This duty requires that the ALJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited," <u>Cowart v. Schweiker</u>, 662 F. 2d 731, 735 (11th Cir. 1981).   Clearly, in order for an informed decision to be made regarding Plaintiff's intellectual functioning, her educational records need to be reviewed and a current valid IQ score obtained. Accordingly, this case must be remanded to the ALJ to fully develop the record and determine whether Plaintiff's impairments meet or equal Listing 12.05.

**V.**   <u>**Conclusion**</u>

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income, is **REVERSED AND REMANDED**[14].

**DONE** this **25th day of March, 2009.**

_____/s/ SONJA F. BIVINS_____
**UNITED STATES MAGISTRATE JUDGE**

---

[14]In light of the remand, the Court has not addressed the second issue raised in Plaintiff's brief, namely whether the ALJ failed to consider the opinions of examining sources.